LONDON & LANCASHIRE INDEMNITY COMPANY, Appellant, vs. CROOK, Respondent.

*November 11—December 8, 1942.*

For the appellant there was a brief by *Bendinger, Hayes, Kluwin & Schlosser* of Milwaukee, and oral argument by *John A. Kluwin*.

*Vilas A. Rasmussen* of Oconomowoc, for the respondent.

MARTIN, J. On September 15, 1932, the Admiral Hotel Company, an Illinois corporation located in the city of Chicago, and defendant entered into a certain lease of the restaurant premises then being operated by the Admiral Hotel Company on the eleventh floor of its hotel building, for and during the term commencing on the 30th day of September, 1932, and expiring on the 30th day of September, 1933. Among other things, the lease provides:

"Lessor [Admiral Hotel Company] agrees to turn over to lessee, for his [her] use in the premises only, all carpets, furniture, draperies, silverware, china, glassware, tools, and utensils now in use for the operation of the dining room and kitchen on the eleventh floor.

"Lessor and lessee shall jointly make a complete written inventory of all articles so to be used and such inventory shall be signed jointly by lessor and lessee.

"Lessee further agrees to maintain the premises, furnishings and equipment at all times in first-class condition, and on termination of this lease, lessee shall return to lessor, 'the premises together with all furnishings and equipment in as good condition as when received, and shall, on the signing of this lease, file with the lessor an indemnity bond in the amount of five thousand ($5,000) dollars, in a surety company acceptable to the lessor as a guarantee to the lessor against any losses or destruction of any property included in the inventory."

On October 22, 1932, defendant made application to appellant company for a fidelity bond, to be furnished to the Admiral Hotel Company under the terms of the lease. In connection with her application for such bond defendant signed the following agreement:

"For good and valuable considerations, I bind myself, my heirs, executors and administrators, to indemnify the London & Lancashire Indemnity Company of America (hereinafter called the "Company"), against any losses, damages, costs, charges, and expenses it may sustain, incur or become liable for in consequence of the said bond or any renewal thereof, or any new bond issued in continuance thereof, as a substitute therefor or otherwise; and any proper evidence of the payment by the company of any such losses, damages, costs, charges or expenses shall be conclusive evidence against me, my heirs, executors and administrators, of the fact and extent of my liability to the company under this agreement. I hereby further agree that the company shall have the right to decline to grant the bond applied for; that, in case the bond is issued, the company shall have the right to withdraw or cancel the bond at any time; that the company shall not be required to , disclose the reasons or grounds upon which any action on its part in connection with the said bond may be based; and that the company shall not be responsible for any loss or damage that I may suffer by reason of any such action, any statutory provisions to the contrary being hereby expressly waived by me. And I do also agree and bind myself, my heirs, executors and administrators, to pay the premium or fees agreed upon, to wit: —— dollars ($——), per annum in advance, while

said bond shall continue in force, and the prevailing rates of premium on such other bonds as it may execute while said bonds shall continue in force.

"In witness whereof I hereunto set my hand and seal, this 6 day of *October, 1932.*

"Witness:

"CONSTANCE GRAEF.

"[Signed] BLANCHE S. CROOK [Seal]."

Pursuant to plaintiff's application, appellant company executed the bond in question on December 1, 1932. Among other things the bond provides:

"Whereas, it is further provided in said lease that the said Blanche S. Crook shall furnish the said Admiral Hotel Company indemnity against loss by reason of loss or destruction of any property included in said inventory;

"Now, therefore, in consideration of the making said lease the said Blanche S. Crook, as principal, and the London & Lancashire Indemnity Company of America, a corporation, as surety, hereby agree to indemnify said Admiral Hotel Company to an amount not exceeding two thousand five hundred and no/100 ($2,500) dollars in the aggregate for all loss and damage which said Admiral Hotel Company may or can sustain during the period from October 1, 1932, to October 1, 1933, by reason of any failure of the said Blanche S. Crook to account for, return to, turn over and deliver to said Admiral Hotel Company, at the termination of the said lease in any manner therein provided, all of the said dining room and kitchen furniture, furnishings and equipment shown in and by said inventory to have been delivered to said Blanche S. Crook under the terms of said lease, *and for any loss or damage to said furniture, furnishings and equipment caused by any wilful acts of the said Blanche S. Crook or her employees,* but not including any loss or damage due to ordinary wear and tear on the said furniture, furnishings and equipment or any causes other than *wilful acts* of the said Blanche S. Crook or her employees; it being the intention hereof that loss or damage due to ordinary wear and tear or any damage to said furniture, furnishings or equipment caused by other than *wilful acts* of said Blanche S. Crook or her employees shall not be covered by this agreement."

On June 3, 1935, the Admiral Hotel Company by an instrument in writing assigned to the Western & Southern Life Insurance Company and to its successors and assigns its interest in and to the foregoing indemnity agreement and any and all claims it had against the London & Lancashire Indemnity Company of America under the bond.

The lease by its terms expired·September 30, 1933. Defendant testified that the lease was never renewed; that after September 30, 1933, she did not operate under the terms of the lease. There is no evidence to the contrary. Defendant continued in charge of the restaurant premises until sometime in May, 1935; but the evidence does not disclose what arrangement she had with the hotel company, covering the period from September 30, 1933, to May, 1935. She testified:

"It was an apartment hotel and the dining room was run as an accommodation to the people who rented the apartments and I was there to serve the guests who were in the hotel. I actually stayed there longer than a year but I did not operate under the terms of the lease after that. The lease was never renewed and I never asked for a renewal of the bond. . . . At the time I took over the hotel an inventory was made but no inventory or checkup was made when I left the hotel. Nothing was said to me about a checkup or making an inventory. . . . The property was in the charge of the hotel management and myself as a matter of convenience."

The inventory which was made at the beginning of the lease period was not offered in evidence and is not in the record. No inventory was taken at the end of the lease period in October, 1933, or in May, 1935, when defendant left the hotel. Defendant further testified:

"I did not misappropriate any property. No one from the hotel ever suggested to me that there was any shortage as long as I was there. My relations with the hotel management were always friendly. When I left the hotel the manager did not suggest that I was short in any way. The explanation I make

for the shortage is that naturally in running a dining room for four years there would be some things missing and there would be some breakage which would be considered general wear and tear. As far as silverware being missing, I had instructions when I took over the dining room, that I was there to cater to the guests in the house. The manager and their help would come up and borrow silver for the guests at the house. Every time they entertained they borrowed the silver services. When I loaned out those things I couldn't go around and demand them. They were taken to different parts of the hotel at the orders of the owner. The owner disposed of some of the so-called crested silverware when a new wall was put in the pantry back of the kitchen."

On August 26, 1935, the Western & Southern Life Insurance Company filed a purported proof of loss with the appellant company. This proof of loss was made by one E. C. Spelman as agent for the Western & Southern Life Insurance Company, of Cincinnati, Ohio, in which he certifies:

"That on or about June 1, 1935, this company suffered loss through the dishonesty of Blanche S. Crook employed as lessee and that the entire amount of property dishonestly misappropriated by said Blanche S. Crook amounts to eight hundred eighty-three and 33/100 dollars ($883.33); that the following is a detailed statement of the said loss, and of all sums due or owing said lessee and the balance stated below is the true net loss from September 15, 1932, to June 1, 1935."

Then following is a list of the articles of personal property, with the values placed thereon, aggregating $883.33. In the absence of the inventory taken at the beginning of the lease period, no inventory having been taken when the lease expired in October, 1933, or at the time plaintiff left the hotel in May, 1935, and it also not appearing what items were disposed of by the owner or were lost through breakage and other ordinary wear and tear, the alleged proof of loss has no probative weight as evidence that any item of personal property therein contained was misappropriated by the respondent or

any of her employees. The proof of loss contained the further statement:

"That the manner in which this property was misappropriated is as follows: According to inventory signed by Blanche S. Crook on or about September 15, 1932, and inventory taken about June 1, 1935, it appears that the above items are missing and have been misappropriated by the said Blanche S. Crook."

There is no evidence of any inventory having been taken except the inventory taken at the beginning of the lease period. Spelman, who made the purported proof of loss in behalf of Western & Southern Life Insurance Company, did not testify in this case. It is significant that no one in behalf of the Admiral Hotel Company, the obligee in the bond, ever made any claim against respondent for a claimed shortage or misappropriation of any item or items specified in the inventory taken and signed by the parties at the beginning of the lease period. There is some evidence to the effect that the Western & Southern Life Insurance Company had a mortgage on the Admiral Hotel Company property, which it was obliged to take over, and at the time of the transaction the Admiral Hotel Company assigned to the Western & Southern Life Insurance Company any claim or cause of action it might have against the respondent under the indemnity agreement and lease upon which plaintiff's action is based. Both the lease and the indemnity agreement were assigned on June 3, 1935.

It should be noted that the indemnity agreement was executed by respondent in connection with the bond which was given to indemnify against loss during a definite period, namely, the particular lease from September 30, 1932, to September 30, 1933. The respondent's uncontradicted testimony is to the effect that she operated the restaurant under the terms of the lease for only one year, and that during the remaining period, from September 30, 1933, until May, 1935, she operated under different arrangements with the hotel management, under which she paid no rent. While the details of

the arrangements are not disclosed by the testimony, she did testify that during this period the property was in the charge of the hotel management and herself as a matter of convenience.

It appears that the Western & Southern Life Insurance Company commenced an action against the London & Lancashire Indemnity Company of America on the 11th day of October, 1935. In connection with this action it appears that the attorney for appellant herein wrote respondent, who was then in Florida, of the commencement of the action in the municipal court at Chicago, and requested that on her way back from Florida she stop at his (attorney's) office; that in response to such letter respondent did stop at the attorney's office and informed him that she would appear in the municipal court and testify whenever needed; that the attorney agreed to let her know when it would be necessary for her to appear; that she was never notified by the attorney or any other person in behalf of appellant company; that she heard nothing further about the case until the commencement of the instant action.

It appears that on October 9, 1936, appellant company settled the case then pending in the municipal court at Chicago for the sum of $400; that in connection with that case, appellant paid attorney fees and costs in the sum of $115. There is no evidence as to what investigation was made by appellant, as to the merits of the case commenced in the municipal court at Chicago. Issue was not joined in that action. The only witness who testified in behalf of the plaintiff in the instant action was Mr. William J. Olson. He testified that he was the superintendent of the surety department of the plaintiff company; that he was in charge of the supervision and handling of the claim made against his company in the matter in question. He testified that subsequent to the receipt of the proof of loss he caused an investigation to be made of this claim. He took no part in the investigation. He did not disclose what investigation had been made or by whom made.

He testified that the result of the investigation was submitted to him. There is no evidence as to what the investigation showed. Although the case involved a very serious charge concerning the honesty and integrity of Mrs. Crook, there is no explanation why she was not given an opportunity to appear and give her testimony in the municipal court action in Chicago.

In the instant action the trial court found that defendant did not violate the terms of the lease; that she did not violate the terms of the bond; that the property described in the alleged proof of loss was not wilfully lost or converted; that the proof of loss upon which the plaintiff made payment purportedly for defalcation of defendant was false and fraudulent; that plaintiff was not legally required to consent to pay any loss; that plaintiff was negligent in failing to find and determine no liability; that defendant had informed plaintiff of her nonliability and had offered to appear in defending against such claim when and if called upon to do so; that the attorney employed by plaintiff was negligent in his investigation, that if he had used due diligence he would have ascertained that there was no liability on the bond. The court made conclusions of law accordingly and dismissed the action. These findings are sustained by the evidence.

Appellant rests its case solely on the so-called "conclusive-evidence clause" in the indemnity agreement, which provides:

"And any proper evidence of the payment by the company [appellant company] of any such losses, damages, costs, charges, or expenses shall be conclusive evidence against me, my heirs, executors and administrators, of the fact and extent of my liability to the company under this agreement."

The rule applicable is thus stated in the Restatement, Security, p. 283, sec. 108, par. (5):

"Where the principal [respondent] has a defense which is known to and available to a surety who has become a surety

with the consent of the principal, and the surety does not assert it [defense], or asserts it in an action without giving the principal notice of the action and an opportunity to defend it, or where the surety as well as the principal has a defense, the principal has no duty to reimburse the surety unless business compulsion requires performance by the surety." The comment on paragraph (5) above, with reference to business compulsion, made under paragraph (f), page 288, has no application in the instant case.

Since the attorney for the plaintiff interviewed Mrs. Crook, we must assume, in the absence of any denial by the attorney, that she informed him of the facts, and further informed him of her willingness to appear in that action and testify in behalf of the appellant.

It further appears that the indemnity agreement, in connection with which the bond was furnished to indemnify the Admiral Hotel Company against loss, was specifically limited to the period covered by the lease, namely, for the term commencing on the 30th day of September, 1932, and expiring on the 30th day of September, 1933. The uncontradicted testimony is to the effect that the lease was not renewed; that upon the expiration of the lease Mrs. Crook and the hotel management entered into other arrangements which continued until May, 1935, during which period the property in question was in the joint charge of the hotel company and Mrs. Crook. Different arrangements having been made, and there being no evidence of any loss having occurred during the twelve months covered by the written lease or any claim asserted that a loss occurred during that period, there would be no liability under appellant's bond dated October 1, 1932, but actually executed on December 1, 1932. Appellant's theory is that the bond covers the whole period from September 15, 1932, to June 1, 1935. In any event, the bond is conditioned so that it does not cover any loss or damage due to ordinary wear and tear of the articles covered by the lease and enumerated in the inventory taken by the parties

at the commencement of the lease period. The bond· is further conditioned so that it covers only such loss and damage as are caused "by wilful acts of the said Blanche S. Crook or her employees."

There is not a scintilla of evidence that the Admiral Hotel Company or its assignee, the Western & Southern Life Insurance Company, sustained any loss or damage creating a *legal* liability on the part of appellant company. The so-called "conclusive-evidence clause" in the indemnity agreement specifically relates to "any losses, damages, costs, charges, and expenses it may sustain, incur or *become liable for* in consequence of the said bond." Then follows the provision, "and any proper evidence of the payment by the company of any such losses, damages, costs, charges, or expenses shall be conclusive evidence against me, my heirs, executors and administrators, of the fact and extent of my liability to the company under this agreement." The words, "and any proper evidence of the payment by the company," are qualified and limited to such losses, damages, costs, charges, or expenses for which the indemnitor becomes liable.

Appellant relies on the holding in *Illinois Surety Co. v. Maguire,* 157 Wis. 49, 54, 145 N. W. 768. It is true that the court in that case, referring to· the conclusive-evidence provision which is like that in the instant case, said:

"Her liability, however, springs from an independent contract, and its provisions, *in so far as they are lawful,* control. By that contract she agreed that the fact of her liability and the amount thereof should be, except for fraud, conclusively established against her by vouchers or other proper evidence showing payment of loss by the guaranty company. The reason and reasonableness of such a provision are apparent. It is to obviate the necessity of litigating the question of plaintiff's liability on its bond, unless such liability is questioned on the ground of fraud, and to relieve the plaintiff from the necessity of proving every fact essential to show liability in order to make out a *prima facie* case.

However, in that case the court said, p. 53:

"Plaintiff showed a *prima facie* case of loss in the amount of $500 resulting from the larceny or embezzlement of Maguire. It showed payment of such loss by a check, by a receipt, and by a release, either of which constituted a 'voucher' showing payment within the meaning of the contract. It also showed payment by the oral testimony of a member of the firm of W. A. Alexander & Company. This testimony was 'other proper evidence' showing payment by plaintiff within the meaning of the contract. *If the provision of the contract referred to is valid,* the plaintiff made out a case showing absolute liability on the part of defendant, unless it was impeached for fraud. That parties to a contract may effectively provide for the kind or *quantum* of lawful evidence necessary, in the absence of fraud, to conclusively establish a fact, cannot be doubted."

In that case there was positive evidence that the employee Maguire had disappeared and that he was short in his accounts in a sum exceeding the amount of his bond, and upon an investigation of the shortage it was determined that the amount exceeded the amount of the bond by a considerable sum. The defendant introduced no evidence to rebut or controvert any testimony offered on behalf of the plaintiff as to the existence of a shortage or as to the fact of the payment of $500 from plaintiff to W. A. Alexander & Company. It will be noted that the court indicated some doubt as to the validity of the conclusive-evidence rule. The language used by the court is, "if the provision of the contract referred to is valid," etc., the court held that plaintiff had established not only a *prima facie* case of loss in excess of the amount of the bond but had made out a case showing absolute liability.

The kind or *quantum* of lawful evidence necessary to conclusively establish a fact can only mean such evidence as is necessary to establish a legal claim and the payment thereof by the surety. In the instant action the trial court found that the proof of loss, upon which plaintiff made payment pur-

portedly for defalcation of defendant, was false and fraudulent. There is not a word of evidence in support of the alleged proof of loss in this case. In the action begun in the municipal court at Chicago, the appellant here knew that the respondent, the principal in the bond in question, had a defense to the action. So far as the evidence discloses, the surety failed to assert that defense. Such defense was available. Respondent offered to appear and testify whenever called upon to do so. The surety failed to give its principal that opportunity.

In any event, the conclusive-evidence rule is not available to appellant company in the case at bar, the trial court having found as a fact that the purported proof of loss for defalcation of the defendant-respondent was false and fraudulent.

*By the Court.*—Judgment affirmed.